# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

BECKY CANNON,

        **Plaintiff,**

     **v.**

                                  **Case No. 2:17-cv-004**
                                  **JUDGE GEORGE C. SMITH**
                                  **Magistrate Judge Elizabeth P. Deavers**

LICKING COUNTY, *et al.*,

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 26).  Plaintiff filed a Response (Doc. 29) and Defendants have replied (Doc. 33).  Defendants' Motion is fully briefed and ripe for disposition.  For the following reasons, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART.**

## I.      BACKGROUND

On April 16, 2016, Becky Cannon ("Ms. Cannon" or "Plaintiff") was at home with her husband, Dan Cannon ("Mr. Cannon"), when she became concerned that Mr. Cannon was suffering a medical emergency.  (Doc. 1, Compl. ¶ 13).  Ms. Cannon called 911 to seek treatment for her husband.  (*Id.*)  Several minutes after she called 911, Emergency Medical Technicians ("EMTs") arrived at her home.  (*Id.* at ¶ 14).  The EMTs evaluated Mr. Cannon on the front porch of their home and found that he was not suffering from any medical conditions.  (*Id.* at ¶ 16).  Shortly thereafter, Deputy Jennifer Green ("Officer Green"), Deputy Robert Meek ("Officer Meek"), and Licking County Sheriff's Deputy Jim Dearing arrived at Ms. Cannon's home.  (*Id.* at ¶ 17).  While waiting for the EMTs to complete their work, Mr. Cannon informed Officer Green

that Ms. Cannon was drinking earlier in the day. (*Id*. at ¶ 18). After learning that Ms. Cannon was intoxicated, Officer Green entered Ms. Cannon's home to speak with her. (*Id*. at ¶ 18). Ms. Cannon instructed Officer Green to leave her home, but Officer Green refused and Ms. Cannon became agitated. (*Id*. at ¶ 20). After refusing to leave Ms. Cannon's home, Officer Green threatened Ms. Cannon with arrest for disorderly conduct if she did not calm down. (*Id*. at ¶ 21). Ms. Cannon again asked Officer Green to leave her home, and Officer Green again refused. (*Id*. at ¶ 22). After a few moments, Officer Meek entered Ms. Cannon's home and she again asked the deputies to leave. (*Id*. at ¶ 23; Doc. 29, Resp. at 9). Officer Meek, thinking he couldn't help the situation, talked Officer Green into leaving the residence, and the officers then left the residence. (Doc. 29, Resp. at 9).

Ms. Cannon, who was upset, began to break plates and other small items inside her own home. (*Id*. at ¶ 25). Ms. Cannon's daughter, Samantha Hottinger ("Ms. Hottinger") was notified that the squad was at Ms. Cannon's home. (Doc. 25-13, Hottinger Dep. at 18). Ms. Cannon was babysitting Ms. Hottinger's children on the day of the incident. (*Id.* at 17–18). Ms. Hottinger headed to the house, removed her children from the house, and instructed a friend to call the police. (*Id*. at 22–25). Her friend called 911 and reported that Ms. Cannon was acting disorderly. (Doc 1, Compl. ¶ 29). Roughly five to ten minutes after they had left the residence, Officers Meek and Green were again dispatched to Ms. Cannon's home. (*Id*. at ¶ 28). Officer Green arrived first and entered Ms. Cannon's home. (*Id*. at ¶¶ 30–34). As before, Ms. Cannon instructed Officer Green to leave, and Officer Green refused. (*Id*. at ¶ 31). Ms. Cannon was shouting at Officer Green and calling her names such as "C and an [sic] F-ing B." (Doc. 26-2, B. Cannon Dep. at 94). Officer Green informed Ms. Cannon that she needed to calm down or she would be placed under arrest for disorderly conduct. (*Id*.).

Officer Meek then arrived at Ms. Cannon's home to assist Officer Green. (Doc. 1, Compl. at ¶ 33). At this time, Officer Green informed Officer Meek that Ms. Cannon needed to be arrested for disorderly conduct. (Doc. 26-2, B. Cannon Dep. at 94). Officer Green asked Ms. Cannon to place her arms behind her back. (*Id*. at 95). According to Ms. Cannon, she said "fucking arrest me" and threw her hands behind her back. (*Id*. at 95). Officer Green then applied one handcuff. (*Id*. at 95–96). Ms. Cannon "reflexively moved her arm slightly" as the handcuffs were being applied. (Doc. 1, Compl. at ¶ 35). Ms. Cannon contends that this was a reflexive reaction to the tight handcuffs. (*Id*). Officer Meek then stated "let me fucking get her" and executed a takedown maneuver to bring Ms. Cannon to the ground. (*Id*. at ¶ 36; Doc. 26-2, B. Cannon Dep. at 97). Ms. Cannon describes the action as a "body slam." (Doc. 26-2, B. Cannon Dep. at 94). The force of this takedown caused Ms. Cannon to briefly lose consciousness. (*Id*. at 100).

At this point, Officers Meek and Green only secured one of Ms. Cannon's arms in the handcuffs. (*Id*. at 97). Once on the ground, Officers Meek and Green delivered several strikes with their hands and knees to Ms. Cannon's chest, side, and legs. (Doc.1, Compl. at ¶ 41). Additionally, Officer Green placed a knee on her back while trying to restrain her. (Doc. 25-1, Green Dep. at 106). After this incident, Officers Meek and Green removed Ms. Cannon from her home and took her to the Licking County jail where she remained until she was released on bail. (Doc.1, Compl. at ¶ 50). Several days later Ms. Cannon sought medical treatment at a hospital for her injuries, including soreness and bruising. (*Id*. at ¶ 57).

Ms. Cannon was charged with disorderly conduct and resisting arrest. (*Id*. at ¶ 51). Ms. Cannon pled guilty to the disorderly conduct charge and entered a pretrial diversion program of intervention in lieu of conviction for the resisting arrest charge. (*Id*. at ¶ 51).

## II.    STANDARD OF REVIEW

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d

502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## III.    DISCUSSION

Ms. Cannon brings causes of action against Officers Meek and Green (in their individual capacities) under 42 U.S.C § 1983 for excessive force in violation of her federal constitutional rights. She also brings claims against Licking County alleging its deliberate indifference to excessive force and fabricating or omitting evidence in violation of her federal constitutional rights. Additionally, Ms. Cannon brings claims against Officers Meek and Green under Ohio state law for battery.

Defendants argue that they are entitled to summary judgment because, even with the facts viewed in a light most favorable to Ms. Cannon, qualified immunity protects Officers Meek and Green and Ms. Cannon cannot establish that Licking County is subject to municipal liability.

This Court will address each of these claims in turn. Before turning to Defendants claims of qualified immunity, this Court must consider whether Ms. Cannon abandoned her fabrication of evidence claims and whether *Heck v. Humphrey* bars the excessive force claims brought against Officers Meek and Green.

## A.    Abandonment of Fabrication of Evidence Claim

In the Sixth Circuit, "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*,

545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)).

Defendants moved for summary judgment on Ms. Cannon's fabrication of evidence claims. (Doc. 26, Defs' Mot. at 2–3). Plaintiff's Response to the Motion (Doc. 29) does not refute any of Defendants' arguments on this claim, nor does it discuss the fabrication of evidence claims in any way. For this reason, this Court deems Ms. Cannon to have abandoned her fabrication of evidence claims and Defendants Motion for Summary Judgment on this claim is **GRANTED**.

**B.     The *Heck v. Humphrey* Hurdle**

Defendants first raise the possibility of *Heck* barring the excessive force claims in their Reply (Doc. 29) to the Plaintiff's Response to the Motion for Summary Judgment.[1] (Doc. 29, Reply at 23). This Court has the discretion to consider arguments raised for the first time in a reply memorandum. *See Helicopters v. City of Columbus*, 879 F. Supp. 2d 775, 779–80 (S.D. Ohio 2012) (Frost, J.). This Court will consider whether the *Heck* bar applies in the case at hand.

Under *Heck v. Humphrey*, 512 U.S. 477 (1994), a § 1983 suit is not permitted if success on such claims would necessarily invalidate a plaintiff's underlying state conviction (unless the state conviction has been reversed, expunged, or invalidated). *See Sanders v. Detroit Police Dep't*, 490 F. App'x 771 (6th Cir. 2012) (citing *Heck*, 512 U.S. at 487). In considering whether *Heck* bars a § 1983 claim, courts must examine the claims raised under § 1983 and the specific state offenses for which the plaintiff has been convicted. *Baker v. Union Twp., Ohio*, No. 1:12-CV-112, 2015 WL 2086597, at *4 (S.D. Ohio May 5, 2015). Thus, if success on Ms. Cannon's § 1983

---

[1] This Court acknowledges that Defendants raised the *Heck* bar issue in their Motion for Summary Judgment. However, in the Motion for Summary Judgment the Defendants only applied the *Heck* argument to the fabrication of evidence claims (which Ms. Cannon has abandoned). Not until their Reply to Ms. Cannon's Response did the Defendants point out that *Heck* could possibly bar the excessive force claims.

excessive force claims would necessarily invalidate the underlying state conviction for resisting arrest, then *Heck* bars such claim.

However, it is important to note the exception to the *Heck* bar that allows a suit to proceed if the underlying conviction is reversed, expunged, or invalidated (known as the "favorable termination" requirement). *See S.E. v. Grant Cty. Bd. of Educ.*, 544 F.3d 633, 637 (6th Cir. 2008) ("The requirement that the conviction or sentence has been reversed, expunged, or invalidated is analogous to the similar requirement in the tort of malicious prosecution and is called the "favorable termination" requirement of *Heck*").  In other words, application of the favorable termination requirement requires that the underlying state claim be terminated in a manner that is favorable to the plaintiff in order for that plaintiff to subsequently raise a § 1983 claim.  The rationale for this rule is that habeas review should be the exclusive remedy for criminal defendants who do not obtain a favorable resolution to their underlying state offenses.  *Id*. at 637.

Typically, a conviction for resisting arrest in Ohio will necessarily invalidate a § 1983 claim of excessive force and therefore trigger the *Heck* bar.  *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 611 (6th Cir. 2014) ("a criminal conviction for resisting arrest in Ohio cannot stand where a criminal defendant successfully asserts the affirmative defense of pre-arrest excessive force; and a § 1983 claim of excessive force would necessarily imply the invalidity of an underlying conviction for resisting arrest").  By logical extension, a conviction for resisting arrest in Ohio then implicates the "favorable termination" requirement for a plaintiff to pass the *Heck* bar.  *Id*. at 610 ("under Ohio's resisting arrest statute, that a claim of excessive force "falls squarely within the 'favorable termination' rule of *Heck* [and such a] claim is a direct attack on the lawfulness of the underlying arrest-which [is] an essential element of [the] resisting arrest

conviction.") (quoting *Jackim v. City of Brooklyn*, No. 1:05 cv 1678, 2007 WL 893868, at *7 (N.D. Ohio Mar. 22, 2007)).

However, in *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, the Sixth Circuit found that "the favorable-termination requirement does not preclude § 1983 lawsuits by persons who could not have their convictions or sentences impugned through habeas review." 501 F.3d 592, 600 (6th Cir. 2007). Stated differently, the Sixth Circuit "applied *Powers* to hold that *Heck's* favorable termination requirement does not apply where, due to the length of a sentence, a petitioner was unable to assert a habeas claim." *Hayward*, 759 F.3d 601 at 610. In *Hayward*, the Sixth Circuit stated that the favorable termination requirement does not apply where § 1983 petitioners use pretrial diversion programs. *Id.* ("*Powers* logically extends to situations in which petitioners elect to participate in pretrial diversion programs to avoid trial and possible jail time").

In the case at bar, Ms. Cannon entered a pretrial diversion program to resolve the charge of resisting arrest. Thus, this Court cannot conclude that Ms. Cannon had a favorable termination to her charge of resisting arrest under Ohio law. However, to the knowledge of this Court, habeas review was not available to her and thus the favorable termination requirement of *Heck* is not applicable in this case. Because the favorable termination requirement is not applicable, *Heck* does not act as a bar for Ms. Cannon's constitutional claims. *See D.D. v. Scheeler*, No. 1:13-CV-504, 2015 WL 892387, at *8 (S.D. Ohio Mar. 3, 2015), *aff'd,* 645 F. App'x 418 (6th Cir. 2016) (finding that *Heck* did not bar plaintiff's constitutional claim if the plaintiff entered a pretrial diversion program). This Court finds that Ms. Cannon's constitutional claims for excessive use of force may proceed.

## C.      Qualified Immunity Analysis

This Court next considers if Officers Meek and Green are entitled to qualified immunity.

8

42 U.S.C. § 1983 imposes civil liability on individuals who act under the color of state law and deprive a citizen of their constitutional rights. *See Brousseau v. Haugen*, 543 U.S. 194, 197–98 (2004). For a plaintiff to state a claim under § 1983 they must show: 1) their constitutional right(s) have been violated, and 2) a person acting under the color of state law caused the violation. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015). There is not dispute as to the second prong of this analysis—that Officers Meek and Green were acting under the color of state law. However, Defendants do contest the first prong—Plaintiff's claim that her constitutional rights were violated and therefore argue that the doctrine of qualified immunity shields them from liability.

The Defendants argue that Officers Meek and Green are entitled to qualified immunity because Ms. Cannon's rights were not violated by Officers Meek and Green. They contend that it is clearly established that officers can use escalated force on an individual they deem to be resisting arrest, and that Ms. Cannon's verbal hostility and arm movement during handcuffing constitutes resisting arrest and thus the takedown and strikes were warranted. Ms. Cannon counters that Officers Meek and Green are not entitled to qualified immunity because she was exposed to excessive force in violation of her constitutional rights. She contends that it is clearly established that an individual who is, at most, passively resisting arrest and poses little threat to law enforcement has a right to be free from a takedown and subsequent strikes.

Qualified immunity protects government officials acting under the color of state law so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When analyzing a government official's claim of qualified immunity, the Court conducts a two-step analysis: 1) has the plaintiff alleged or shown facts evidencing a violation of a constitutional right, and 2) was the alleged

violation of that constitutional right "clearly established" at the time of the incident. *Stanfield v. City of Lima*, 727 F. App'x 841, 845 (6th Cir. 2018) (quoting *Pearson*, 555 U.S. at 232). If a plaintiff is to defeat a claim of qualified immunity, the court must answer the prior questions in the affirmative. *Stanfield*, 727 F. App'x at 845.

Thus, in evaluating whether qualified immunity protects Officers Meek and Green from Ms. Cannon's § 1983 claims for excessive force, this Court must first consider if Officers Meek and Green violated Ms. Cannon's constitutional rights. If they did so, this Court will then determine if those constitutional rights were clearly established at the time of the incident.

### 1. Did Officer Meek or Officer Green Violate Ms. Cannon's Fourth Amendment Right by Using Excessive Force

The facts in this case present a "he said, she said" scenario where the outcome largely depends on whose story one believes. In these types of situations, a jury is best equipped to decide which set of facts to believe. For this reason, and the reasons stated below, there are genuine issues of material fact regarding whether Officers Meek and Green used excessive force in violation of Ms. Cannon's constitutional rights.

The Fourth Amendment governs police officers' use of force during an arrest. *See Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The Fourth Amendment requires that law enforcement's use of force is reasonable. *Graham*, 490 U.S. 386 at 395. The Fourth Amendment authorizes police officers to use force in effecting an arrest, "but the question is . . . whether [officers] could reasonably use the *degree* of force employed against the [suspect]." *Stanfield*, 727 F. App'x at 845 (quoting *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013)). The degree of force inquiry is an objective inquiry that does not utilize the benefit of 20/20 hindsight, but rather, "must be evaluated from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. 386 at 396.

In evaluating a police officer's use of force, courts consider three factors: 1) the severity of the crime, 2) the suspect's immediate threat to the safety of the officers and others, and 3) the suspect's evasion or resistance of arrest. *Stanfield*, 727 F. App'x at 846 (quoting *Graham*, 490 U.S. 386 at 396). With these three factors in mind, a court must then determine "whether the totality of the circumstances justified a particular sort of seizure." *Id.* (quoting *Graham*, 490 U.S. 386 at 396). Because this is a motion for summary judgment, this Court first views the alleged facts in a light most favorable to the non-moving party (here, Ms. Cannon); because this case involves qualified immunity, this Court then views the non-moving party's facts as a reasonable officer on the scene would. *Id*. at 845–46 (quoting *Graham*, 490 U.S. 386 at 396).

### a.       Severity of the Crime

The first factor—the severity of the crime—weighs in Ms. Cannon's favor. Officers Meek and Green returned to Ms. Cannon's house based on a report of a disturbance (screaming, breaking of plates, etc.). Eventually, Officers Meek and Green arrested Ms. Cannon for disorderly conduct.

Courts have found that disorderly conduct is not a "serious" crime in determining the amount of force that a law enforcement officer should use to effect an arrest. *See Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015) (citing *Davis v. Yovella,* 110 F.3d 63, 1997 WL 159363 at *1, *6 (6th Cir. Apr. 2, 1997) (table) and *Thacker v. Lawrence Cnty.,* 182 F. App'x 464, 472 (6th Cir. 2006)). Because disorderly conduct is not a serious or inherently violent crime, this would lead a reasonable officer on the scene to use a reduced amount of force to effect the arrest.

Defendants contend that the severity of the situation was elevated due to the possibility that children were in the house. (Doc. 26, Defs.' Mot. at 24). Ms. Cannon responds that Officers Meek and Green could not have considered the safety of the children as a factor because Ms. Hottinger removed the children from the house before she arranged to have 911 called. (Doc. 29, Resp. at 36). Defendants' argument is unpersuasive for several reasons.

11

First, Officer Green was alone with Ms. Cannon for 5–10 minutes before Officer Meek arrived. During these 5–10 minutes, Officer Green took no action other than attempting to calm Ms. Cannon. This lack of urgency on Officer Green's part indicates that she was not seriously concerned about any potential threat to the children.

Second, according to Ms. Cannon's testimony, Ms. Hottinger had already removed the children from the home when Officers Meek and Green arrived. (Doc. 29, Resp. at 10, 36). Ms. Hottinger informed Officer Green that she was picking up the children as Officer Green was leaving the residence after the first visit. (Doc. 25-13, Hottinger Dep. at 19–20). Therefore, Officer Green had reason to believe the children were no longer in the house. Even if Officers Meek and Green were unaware that the children had been removed from the home, there was no evidence that Ms. Cannon was a threat to the children during the incident.

For these reasons, this Court does not believe that it was reasonable for Officers Meek or Green to believe the situation was more severe because of the children.

### b. Immediate Threat Posed by Ms. Cannon

The second factor—the threat posed to the officers and others—weighs slightly in favor of Officers Meek and Green. While Officers Meek and Green do not explicitly state that they believed Ms. Cannon was a threat to their safety or the safety of others, they focus on several facts from which it can be implied that Ms. Cannon posed a threat, namely: 1) Ms. Cannon's intoxication, 2) Ms. Cannon's hostile demeanor (shouting, breaking plates, cursing), and 3) Ms. Cannon "squaring up" to fight Officers Meek and Green. (Doc. 25-1, Green Dep. at 101). However, Ms. Cannon contends that she did not "square up" to fight the officers, and her husband's deposition reflects the same. (Doc. 25-12, D. Cannon Dep. at 60; Doc. 30, B. Cannon Dep. at 136). This constitutes a materially disputed fact and in reviewing the entirety of the evidence on

this issue in a light most favorable to Ms. Cannon, a reasonable jury could potentially find that Ms. Cannon did or did not pose an immediate threat to Officers Green and Meek.

The Sixth Circuit has held that an intoxicated individual can create a more volatile situation. *Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007). While intoxication can be considered grounds for handcuffing an individual, the reasonableness of the amount of force used in the process will depend on other factors, such as the individual's resistance and hostility. *Stanfield*, 727 F. App'x at 845 (citing *Solovy v. Morabito*, 375 F. App'x 521, 524 n.4 (6th Cir. 2010)). While the Court will analyze Ms. Cannon's alleged resistance to arrest as the third factor for excessive force, it is appropriate to consider Ms. Cannon's level of hostility under this factor.

Ms. Cannon admits that she was acting in a disorderly manner by breaking items, shouting, and calling Officer Green offensive names (including calling her a "C and an [sic] F-ing B"). (Doc. 30, B. Cannon Dep. at 94). These events took place inside of Ms. Cannon's home, which could contribute to a more unsafe environment for law enforcement. (Doc. 25-6, Meek Dep. at 48).

On one hand, breaking items is violent, the name calling shows anger directed towards Officer Green, and the setting would put a reasonable officer on higher alert. This situation could make Officers Meek and Green reasonably feel that the situation might escalate to an unsafe one. On the other hand, there is no allegation that Ms. Cannon threw items at Officers Meek or Green and Officers Meek or Green never felt the need to deploy a weapon or prepare a weapon in case Ms. Cannon attacked or advanced upon them. Further, according to Ms. Cannon, Officer Green had a smile on her face during the interaction. (Doc. 30, B. Cannon Dep. at 94). Officer Green also spent 5–10 minutes in the house with Ms. Cannon alone while waiting for Officer Meek to arrive on the scene. (Doc. 25-1, Green Dep. at 102). Lastly, there is no evidence that Ms. Cannon had a weapon or that Officers Meek and Green had reason to believe that Ms. Cannon had a

13

weapon. While Ms. Cannon's admitted behavior was unbecoming, it apparently did not concern Officer Green enough to ready a weapon or step outside for her safety while waiting for Officer Meek. This indicates that Officer Green did not really fear for her safety.

On balance, considering Ms. Cannon's intoxication, the breaking of items, the hostility directed towards Officer Green, and the setting of the situation, a reasonable officer would conclude that Ms. Cannon was a greater threat than a non-inebriated, calm individual. However, due to the mitigating factors, the threat to Officer Meek and Green was most likely minimal.

### c.    Resisting Arrest

The third factor—the arrestee's resistance to arrest—requires this Court to consider if Ms. Cannon was actively resisting or evading arrest. *Goodwin*, 781 F.3d at 323. In doing this, this Court will consider each event of the incident separately. *See Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) (analyzing three separate uses of force although part of the same incident).[2] Viewing the facts in a light most favorable to Ms. Cannon, there are two instances of possible resistance that must be analyzed: 1) Ms. Cannon's actions prior to Officer Meek's takedown, and 2) Ms. Cannon's actions after the takedown.

### i.    Takedown Maneuver

Officer Meek and Officer Green rely on three primary actions to defend the takedown of Ms. Cannon: 1) Ms. Cannon's refusal to follow an instruction to put her arms behind her back and Ms. Cannon's accompanying comment to "fucking arrest me" (Doc. 26-2, B. Cannon Dep. at 94);

---

[2] When determining whether to view the uses of force as one single use of force or two separate uses of force, some Sixth Circuit caselaw asks whether the officers had time to reassess the threat level posed by the arrestee. *See Stevens-Rucker v. City of Columbus, OH*, 739 F. App'x 834 (6th Cir. 2018), *cert. denied sub nom. Stevens-Rucker v. Frenz*, 139 S. Ct. 1291 (2019). However, the outcome in this case would not change whether this Court views the entire incident as one use of force or multiple uses of force.

2) Ms. Cannon moving her arm during the application of the handcuffs; and 3) Ms. Cannon "squaring up" to fight the officers. These actions are all refuted by Ms. Cannon.

While Officers Meek and Green contend that Ms. Cannon refused to put her arms behind her back, Ms. Cannon contends she did the exact opposite (Doc. 26-2, B. Cannon Dep. at 95). Further, Ms. Cannon contends that she said "fucking arrest me" after being told to place her hands behind her back, and then placed her hands behind her back. (*Id*.). Viewed in a light most favorable to Ms. Cannon, a reasonable jury could or could not interpret this as verbal acquiescence to arrest while Officers Meek and Green contend it was defiance (Doc. 26, Defs.' Mot. at 8, 25).

Ms. Cannon placing her arms behind her back is an act of surrender, and the Sixth Circuit has held that an act of surrender should be considered when determining the reasonableness of an officer's actions. *See Baker v. City of Hamilton, Ohio*, 471 F.3d 601 (6th Cir. 2006). In *Baker*, the Sixth Circuit found that an arrestee raising their hands into a surrender position showed that the arrestee was unarmed and posed little threat to law enforcement. *Id*. at 607. The court found that due to this act of submission the officer's strike to the arrestee's head was unreasonably severe. *Id*.

Similarly, Ms. Cannon (according to her account of the story) placed her hands behind her back to be handcuffed. Like raising one's hands, this is an act of surrender which would show Officers Meek and Green that she was unarmed and surrendering to custody. This act of surrender, paired with the comment of "fucking arrest me," create a genuine issue of material fact as to whether a reasonable officer would view Ms. Cannon as resisting arrest.

Officers Meek and Green contend that Ms. Cannon moving her arm during handcuffing was resistance to arrest that justified the takedown. (Doc. 26, Defs.' Mot. at 26) ("Due to at least the perceived resistance exhibited by Plaintiff, Deputy Meek escorted Plaintiff to the ground").

Ms. Cannon contends that this was an involuntary "flinch" to the pain of a handcuff. (Doc. 26-2, B. Cannon Dep. at 96–97). The Sixth Circuit has held that a takedown based on minimal, and possibly involuntary movement, does not justify the use of a takedown maneuver. *See Stanfield*, 727 F. App'x 841.

In *Stanfield*, an individual was pulled over while intoxicated. *Id.* at 844. While trying to put the arrestee's hands behind his back, the arrestee lost his balance and stuck his foot out while twisting in an attempt to not fall to the ground. *Id.* The officers then took the arrestee to the ground. *Id.* The arrestee argued that such an action did not constitute active resistance and was simply the result of losing his balance. *Id.* at 848. The Sixth Circuit agreed and found that, while a reasonable officer on the scene could perceive such an action as active resistance, that type of action does not necessarily permit a takedown maneuver. *Id.* at 848 ("Slight twisting and leaning by a portly, elderly man while two young officers hold his arms behind his back does not justify the tackle executed by Montgomery. Stanfield's crime was moderately severe and there was little reason to suspect he presented an immediate threat. Therefore, Montgomery's conduct was objectively unreasonable . . .").

In this case, Ms. Cannon's flinching to painful handcuffs mirrors Stanfield's loss of balance. Both actions are involuntary reactions to an outside stimulus. Further, like in *Stanfield* where the arrestee was not a threat to the officers, Ms. Cannon had already presented her hands behind her back for handcuffing as an act of surrender. Ms. Cannon was not under arrest for a serious crime nor was there evidence that she was armed. For these reasons, while a reasonable officer might have perceived the flinch as resisting arrest, a reasonable jury could still consider a takedown maneuver to be excessive given the circumstances.

Looking at the totality of the circumstances in a light most favorable to Ms. Cannon, she had not committed a serious crime, posed a limited threat to the officers, had offered her surrender, and her most active form of resistance (flinching) was an involuntary reaction to painful handcuffs. Given these facts, there is a genuine issue of material fact as to whether the takedown maneuver executed on Ms. Cannon was excessive.

### ii.     Hand and Knee Strikes

The hand and knee strikes that Officer Meek and Green delivered to Ms. Cannon while she was on the ground is a simpler analysis than the previously discussed takedown maneuver.

Sixth Circuit precedent makes it clear that individuals have a right to not be struck gratuitously. *See Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). This right to be free from gratuitous force encompasses the idea that officers cannot use heightened force when an individual is not resisting and does not pose a threat to their safety. *See Kalvitz v. City of Cleveland*, No. 17-4174, 2019 WL 851435 (6th Cir. Feb. 21, 2019) (citing *Phelps v. Coy*, 286 F.3d 295, 301–02 (6th Cir. 2002) and *Lawler v. City of Taylor*, 268 F. App'x 384, 387–88 (6th Cir. 2008)). Officers who exercise "that kind of 'gratuitous force' lasting 'beyond the point at which any threat could have reasonably been perceived' violate the Fourth Amendment." *Id*. at *3 (quoting *Lawler*, 268 F. App'x at 388).

In the case at hand, Officers Meek and Green continued to strike Cannon after they took her to the ground. According to Ms. Cannon and her husband, she did not pose a threat because she was not resisting arrest, was not able to overpower Officers Meek and Green, and there is no evidence that she was armed or had immediate access to a weapon. *See Flanigan v. Panin*, 724 F. App'x 375, 378 (6th Cir. 2018) (citing similar factors in finding that law enforcement's strikes to the arrestee's head could be considered excessive). Further, Ms. Cannon testifies that she

momentarily lost consciousness after being taken to the ground; this would render her incapable of resisting. (Doc. 26-2, B. Cannon Dep. at 100). Finally, Ms. Cannon verbally expressed her submission by shouting "Okay! Okay!" as evidence that she had "had enough." (*Id.* at 99–100).

Within the range of force available to law enforcement, hand and knee strikes delivered to the body are not particularly egregious conduct. However, the Sixth Circuit requires "officers to use 'the least intrusive means available.'" *Flanigan*, at 378 (citing *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007)). Here, given the situation, a reasonable jury could find that the least intrusive means available would be no strikes at all. Thus, a reasonable jury could find the hand and knee strikes once Ms. Cannon was on the ground to be excessive and violative of her Fourth Amendment rights.

### 2.     Were the Constitutional Rights "Clearly Established"

Having found that a reasonable jury could find a violation of Ms. Cannon's constitutional rights, the Court now considers whether those rights were "clearly established."

To defeat a claim of qualified immunity, a plaintiff must show that the right violated is clearly established to the point that a reasonable official would understand that their actions violates the right. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). To be clearly established at the time of the conduct in question, the constitutional right must have been recognized by the United States Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits. *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996); *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 2017). "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right." *Sheets*, 97 F.3d at 166. "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but

it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As a general principle, Sixth Circuit precedent clearly establishes that law enforcement's use of excessive force violates an individual's Fourth Amendment rights. *See Stanfield*, 727 F. App'x at 849 (citing *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001)). However, "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Thus, the issue is not whether Officers Meek and Green knew that excessive force would violate Ms. Cannon's Fourth Amendment rights, but rather, whether their specific actions constituted excessive force in conjunction with Ms. Cannon's actions (i.e., does an individual have a clearly established constitutional right to be free from excessive force of takedown and hand and knee strikes if believed to be resisting arrest).

Ms. Cannon cites to several cases demonstrating the broad principle that excessive force violates an individual's Fourth Amendment rights. (*See* Doc. 29, Resp. at 38–41). However, most of the cases Ms. Cannon cites relies on the principle that the suspect was "clearly subdued" or "not actively resisting arrest" or "being restrained an in full control hold by two officers" or "neutralized." (*See id.* (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004); *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011); *Solomon v. Auburn Hills Police Dep't,* 389 F.3d 167, 175 (6th Cir. 2004)). Those cases differ from the situation at hand because a reasonable officer could view Ms. Cannon's reaction to the handcuffs as resistance to arrest. The only case Ms. Cannon cites that could place Officers Meek and Green on notice that their conduct was unconstitutional is *Smith v. City of Troy, Ohio*, 874 F.3d 938 (6th Cir. 2017).

In *Smith*, the arrestee pulled his arm away from an officer once the officer pried the arrestee's hands off a fence. *Smith*, 874 F.3d 938 at 942. The officer then executed a leg sweep taking the arrestee to the ground. *Id.* The Sixth Circuit found that "A reasonable juror could conclude that, in pulling his arm away, Smith's resistance was minimal and that Osting's response in taking Smith to the ground was excessive." *Id.* at 946. However, *Smith* is different from the case at hand because in *Smith* there was no evidence the arrestee had committed a crime, the officer did not tell the arrestee that he was under arrest, and there were disputes about whether the arrestee was resisting or whether simply being noncompliant with law enforcement's orders. *Id.*

Even if *Smith* didn't contain these important distinctions, *Smith* was decided in 2017 and this case arises from an incident that occurred in 2016. Therefore, even if *Smith* establishes the principle that pulling an arm away from an officer during an arrest does not justify a takedown, that case could not have put Officers Meek and Green on notice because it was published after the incident occurred.[3]

However, the Sixth Circuit has stated that "it is clearly established that the use of force on a non-resistant or passively-resistant individual may constitute excessive force . . ." and has applied this concept to involuntary reactions. *McCaig v. Raber*, 515 F. App'x 551, 556 (6th Cir. 2013). *McCaig* has a similar set of facts to the case at hand.

In *McCaig*, law enforcement responded to reports of an altercation outside of a bar in Michigan. *Id.* at 552. As law enforcement approached, they saw the arrestee strike another individual in the face. *Id.* Law enforcement then informed the arrestee that he was under arrest, and the arrestee put his hands up in a surrender position and held his hands out for handcuffing.

---

[3] Ms. Cannon encounters the same problem with the case that this Court relies upon to find a constitutional violation, *Stanfield v. City of Lima*, 727 F. App'x 841 (6th Cir. 2018). In *Stanfield*, the Sixth Circuit held that a takedown based on minimal and possibly involuntary movement does not necessarily justify the use of a takedown maneuver. However, that case was decided in 2018 and thus cannot serve as notice to Officers Meek and Green.

*Id*.  Law enforcement then placed a handcuff on the arrestee's left hand and held his right hand.

*Id*.  Law enforcement instructed the arrestee to place his right hand behind his back, which he could not do because law enforcement was restraining the arrestee's arm.  *Id*.  An officer then screamed at the arrestee to place his hand behind his back so loudly that it hurt the arrestee's ear and caused the arrestee to "jerk away" from law enforcement.  *Id*.  Law enforcement then executed a takedown maneuver that resulted in a broken wrist.  *Id*.  Law enforcement testified that the arrestee was trying to pull away from them, and that justified the use of force.  *Id*.  The district court denied qualified immunity because there were issues of material fact regarding whether the arrestee's actions constituted resistance, and the Sixth Circuit agreed.  *Id*. at 552 and 556.

The Sixth Circuit reasoned that because the arrestee was unarmed, made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would "go easy," that a reasonable jury could find law enforcement used excessive force.  *Id*. at 555.  Further, the court reasoned that the law was clearly established because the Sixth Circuit has repeatedly held that various types of force on a subdued or restrained suspect, or a suspect who poses no serious threat to law enforcement can be excessive.  *Id*. at 555–56 (collecting cases).

In *Aldrich v. City of Columbus*, No. 2:15-cv-404, 2016 WL 6084570, at *6 (S.D. Ohio Oct. 18, 2016) (Graham, J.), this Court applied the principles set forth in *McCaig* to a set of facts similar to this case.[4]  In *Aldrich*, an officer approached an individual leaning against the hood of a vehicle who was suspected of stealing a van.  *Id*. at *1.  As the officer approached, the officer ordered the suspect to get on the ground and the suspect refused.  *Id*.  Eight to nine seconds later, the officer approached the suspect, smacked a cigarette out of the suspect's hands, and grabbed the suspect to escort him to the police cruiser.  *Id*. at *2.  When the officer grabbed the suspect, he felt the suspect

---

[4] While *Aldrich* cannot serve as notice to Officer Meek and Green because it was decided after the incident at hand, it is instructive to see how this Court has applied the principles of *McCaig* in similar situations.

"tense up" indicating that the suspect was jerking away from him. *Id.* Because of this reaction, the officer took the suspect to the ground causing injuries. *Id.*

This Court stated that "where an officer had ahold of a suspect who was compliant, not fleeing, and posed no threat with his hands exposed, performing a takedown may be excessive force." *Id.* at \*5 (citing *McCaig*, 515 F. App'x at 556 (6th Cir. 2013)). Unlike in *McCaig*, the suspect in *Aldrich* was not explicitly vocally compliant; this Court found that difference to be insignificant. *Id.* at \*5. In *Aldrich*, this Court had the benefit of a video disputing that the suspect 'jerked away" and noted that "if Aldrich had [jerked away], Officer Singleton's takedown would be permitted as an attempt to restrain a fleeing suspect." *Id.* However, the Court continued to state "the video shows that the only movements Aldrich made were those that a reasonable jury could believe were caused by Officer Singleton's application of force" and

> even if Aldrich did tense up when Officer Singleton grabbed him, this cannot lead to an automatic escalation of force to a face first arm-bar takedown. It would be an odd case indeed if a person did not tense up when an officer smacked a cigarette out of their hand and quickly grabbed their arm, forcing it into an uncomfortable position.

*Id.* (citing *McCaig*, 515 F. App'x at 556. This Court found it problematic that a suspect "tensing up" would give the green light for increased force, because if that were acceptable then officers could induce involuntary reactions to justify an increase in force. *Id.*

This Court in *Aldrich* denied qualified immunity and believed that the law was clearly established, largely based on *McCaig*: "the use of a takedown on an unrestrained, non-fleeing, non-violent suspect has been held, in a materially similar circumstances, to be objectively unreasonable. *Id.* at \*7 (citing *McCaig*, 515 F. App'x at 556). This Court found that in both *Aldrich* and *McCaig*, the impetus for the takedown was "a tensing up or jerking away that was at

least arguably caused by the officers themselves and could easily be construed as a natural, involuntary reaction and not an attempt to flee" and thus, the law was clearly established. *Id.*

Ms. Cannon's actions are similar to both *McCaig* and *Aldrich*. While Ms. Cannon was more belligerent than either of the arrestees in *McCaig* and *Aldrich*, that difference does not justify Officer Meek's takedown of Ms. Cannon. A direct refusal to follow an officer's commands in *Aldrich* did not preclude a finding that a takedown was excessive, and Ms. Cannon's belligerence will not preclude this Court from finding Officer Meek's takedown to be excessive. Like in *McCaig*, Cannon surrendered to Officers Meek and Green by putting her hands behind her back for handcuffing and she verbally acquiesced to arrest by stating "just fucking arrest me."

The most important similarity is that, according to Ms. Cannon's story, her reaction to the handcuffs was an involuntary flinch due to the pain of the handcuffs. This parallels both *McCaig* and *Aldrich*. Unlike in *Aldrich*, this Court does not have the benefit of video evidence and thus finds that there is a genuine issue of material fact as to whether Ms. Cannon's reaction to the handcuffs was slight and involuntary or an attempt to flee.

For the reasons stated above, it is clearly established in this Circuit that that a reasonable jury could find that a full body takedown in response to a minor and involuntary reaction is excessive. Thus, Officer Meek was on notice that his takedown could constitute excessive force.

Finally, it is clearly established in the Sixth Circuit that individuals have a right to be free from gratuitous force. *See Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). The Sixth Circuit has "held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006). Thus, Officers Meek and Green were on notice that striking an

individual who was taken to the ground, not resisting, and posed little threat to their safety was gratuitous and excessive.

Therefore, because the evidence shows genuine issues of material fact as to whether Officer Meek and Green's use of force was reasonable, and because the law in this area is clearly established, this Court finds that Officers Meek and Green are not entitled to qualified immunity.

## D. Municipal Liability Claims

Ms. Cannon has brought claims against Officers Meek and Green (in their official capacities), Tim Bubb, Rick Black, and Duane Flowers (in their official capacities as county commissioners), Randy Thorp (in his official capacity as Licking County Sheriff), and Licking County. The claims that Ms. Cannon appears to bring against these Defendants include failure to train, inadequate supervision, inadequate discipline, and unconstitutional policies. (Doc. 1, Compl. at ¶ 72). Defendants move for summary judgment on Ms. Cannon's municipal liability claims under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The Defendants argue that Licking County cannot be held liable because Licking County's use of force policy is adequate and that Licking County's officers undergo sufficient training to demonstrate the county is not deliberately indifferent to the rights of its citizens. Ms. Cannon counters that Licking County's use of force policy and training is not sufficient to adequately train its officers on the constitutional requirements for use of force. Additionally, Ms. Cannon argues that, due to the number of reported uses of force between 2014 and 2016, Licking County was on notice that its officers must be trained in the use of force.

At the outset, it should be noted that all claims against individuals in their official capacities are effectively claims against Licking County. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). Despite making claims for inadequate supervision and inadequate discipline Ms. Cannon did not respond to arguments presented in the Motion for Summary Judgment regarding

those claims and has thus abandoned them. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)). Further, it seems that Ms. Cannon's separate claims for failure to train and unconstitutional policies are really one in the same: "the fault is in the policy and custom of training itself." (Doc. 29, Resp. at 42). It appears that the alleged unconstitutional policy is Licking County's policy of training its law enforcement officers. Therefore, Ms. Cannon has abandoned all claims regarding municipal liability except for the claim that Licking County has failed to adequately train its officers. Therefore, Defendants are entitled to summary judgment on all of Plaintiff's municipal liability claims except for the failure to train claim against Licking County. This Court turns to that claim now.

The *Monell* decision made clear that local government units could be held liable for § 1983 claims, but that "§ 1983 did not support *respondeat superior* liability, reasoning that 'Congress did not intend municipalities [and other local government units] to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (quoting *Monell*, 436 U.S. at 691). A plaintiff can identify one of four methods "[t]o show the existence of a municipal policy or custom leading to the alleged violation:" "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1381 (2016) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

In *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), the Supreme Court articulated the standard for failure to train claims. The inadequacy of police training may serve as the basis for

§ 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id*. at 387. The Sixth Circuit has held that "to establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (quoting *St. John v. Hickey*, 411 F.3d 762, 776 (6th Cir. 2005) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005))).

In *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992), the Sixth Circuit applied the *Harris* test and further defined what a plaintiff had to prove to demonstrate that a training program is the moving force behind a constitutional violation. The court held that, to prove a failure to train claim, a plaintiff must establish: (1) that the training program was inadequate for the tasks that officers must perform; (2) that the inadequacy was the result of the city's deliberate indifference; and (3) that the inadequacy was "closely related to" or "actually caused the . . . injury." *Russo*, 953 F.2d at 1046 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)); *see also Berry v. City of Detroit*, 25 F.3d 1342, 1346 (6th Cir. 1994).

Ms. Cannon argues that Licking County does not explicitly train its officers to use "the least amount of force available" and therefore, Licking County is deliberately indifferent to the constitutional rights of its citizens. (Doc. 29, Resp. at 45) ("Licking County Sheriff's Deputies have not been trained on the constitutional considerations and are not currently told to use the least available force"). However, Ms. Cannon has failed to show a history of prior unconstitutional conduct proving that Licking County has an inadequate training policy. Ms. Cannon advances two main arguments: 1) *Canton* allows for the possibility that a single instance is sufficient to find an

unconstitutional policy; and 2) Licking County has reviewed many instances of its officer's use of force, and therefore the need for additional training is obvious.

While Ms. Cannon is correct that *Canton* contemplates a "narrow range of circumstances" that could make up single-incident liability, this case is not one which falls within that narrow range. *See Connick v. Thompson*, 563 U.S. 51, 64 (2011) (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). *Canton* contemplated a case where a municipality arms its law enforcement with deadly weapons and makes no effort to train them on use of the weapons. *Canton*, 489 U.S. 378 at 390 n.10. The Supreme Court reasoned that a single constitutional violation can be enough to find deliberate indifference if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390.

However, the *Canton* hypothetical assumes that law enforcement has no knowledge of the constitutional standards associated with deadly force and that in the absence of training officers could not obtain the necessary legal knowledge they require. *See Connick*¸ 563 U.S. at 64. In *Connick*, the Court juxtaposed the *Canton* hypothetical with a situation where the parties had a general knowledge of their legal requirements. *Id*. at 67 ("the *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force. But it is undisputed here that the prosecutors in Connick's office were familiar with the general Brady rule"). In the case at hand, the record reflects that Officers Meek and Green had received general training on the use of force.

Officers Meek and Green received training on use of force and the Licking County use of force policy directs them to use only force that is necessary.[5] (Doc. 25-6, Meek Dep. at 22; Doc. 25-14, Evans Dep. at 17). Using the amount of force that is necessary is tantamount to using the least available force; for if an officer uses more than necessary force, that force must then be unnecessary. This Court has held that using "necessary" force reflects the appropriate constitutional standard. *See Hysell v. Thorp*, No. 2:06-CV-170, 2009 WL 262426, at *14 (S.D. Ohio Feb. 2, 2009) (Holschuh, J.) ("officers are entitled to use some degree of physical force, but they may use only as much force as is reasonably necessary.") (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because the officers were directed to use necessary force, and that reflects the constitutional standard, Ms. Cannon's argument that Officers Meek and Green were not properly trained on the constitutional limits for use of force fails.

Additionally, Officers Meek and Green were trained on the use of force continuum (which teaches force in response to a suspect's actions) through the Central Ohio Technical College. (Doc. 25-1, Green Dep. at 16–17; Doc. 25-6, Meek Dep. 15–16). Officers Meek and Green use the "Blue Team" template to document their use of force. (Doc. 25-6, Meek Dep. at 61). This template requires the officers to list what force was used, whether that force was effective, and any escalating uses of force. (*See* Doc. 25-11, Meek Dep. Exhibit 4). This demonstrates an inherent understanding of the use of force continuum as some form of it is included in the Blue Team report. Further, Officer Meek stated that it is the suspect's level of resistance that factors into when it is "necessary" to use force. (Doc. 25-6, Meek Dep. at 48). This

---

[5] The Licking County use of force policy states: "Deputies will use only that force necessary to effect an arrest, detention, mission, or other lawful objective. The amount or type of force needed will be determined as an incident progresses. A deputy must react to the aggressor in a manner that will limit injury to himself, the suspect, and the public." (Doc. 25-6, Meek Dep. at 21–22).

evidence shows that Officers Meek and Green were trained on, exposed to, and have knowledge of the use of force continuum.

Officers Meek and Green are also required to conduct an annual review of the use of force policy and pass a test on the subject. (Doc. 25-1, Green Dep. at 13, 31; Doc. 25-6, Meek Dep. at 21, 23). The Sherriff's office also has bimonthly meetings where officers can seek additional guidance on any questions they may have. (Snodgrass Dep. at 26). Finally, Licking County is accredited through the Commission on Accreditation for Law Enforcement Agencies, Inc. ("CALEA"), and Officer Green showed familiarity with its training and went as far to state that "it's another type of policy that *we* have." (Doc. 25-1, Green Dep. at 47) (emphasis added). CALEA sets nationwide, best-practices standards, and other courts have used CALEA accreditation as evidence of sound policies. *See Woodward v. City of Gallatin, Tenn.*, No. 3:10-1060, 2013 WL 6092224 (M.D. Tenn. Nov. 19, 2013); *Glowka v. Bemis*, No. 3:12-CV-345, 2015 WL 8647702 (S.D. Ohio Dec. 14, 2015).

For these reasons, this Court cannot say that Officers Meek and Green have no knowledge or training on excessive force standards such that it would be "obvious" that additional training is necessary to prevent constitutional violations. Therefore, this case does not fall within the narrow range of single incident liability circumstances that *Canton* contemplates, and Ms. Cannon must show a pattern of constitutional violations evidencing Licking County's deliberate indifference to prevail.

Licking County reviews all uses of force that its officers report. (Doc. 25-14, Evans Dep. at 20). Ms. Cannon argues that because Licking County deemed approximately 300 uses of force as reasonable between 2014 and 2016 that Licking County was on notice that its officers must be trained in the use of force. (Doc. 29, Resp. at 42). Notwithstanding the fact that the Licking

County's officers are trained in the use of force (as discussed above), Ms. Cannon fails to establish whether any of these uses of force were unreasonable. Incidents of force alone are not sufficient to establish that Licking County has pattern of officers committing constitutional violations. *See Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018) ("The fact that Lieutenant Bell had not disciplined an officer for excessive force does not show that there was a history of excessive force or need for additional training. In fact, if anything, that evidence standing alone shows there was not a pattern of excessive force"). Thus, there is no evidence showing a pattern of constitutional violations. Licking County's use of force policy, the training its officers receive, and the use of force review, all contradict the claim that Licking County is deliberately indifferent to the constitutional rights of its citizens.

For the above reasons, this Court **GRANTS** summary judgment to Licking County and the individual Defendants who were sued in their official capacities.

E.       **State Law Battery Claims**

This Court now turns to Ms. Cannon's state law battery claims against Officers Meek and Green. Generally, under Ohio law, "[i]f an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery." *D'Agastino v. City of Warren*, 75 F. App'x 990, 995 (6th Cir. 2003) (ellipsis omitted) (quoting *City of Cincinnati v. Nelson*, No. C–74321, 1975 WL 181750, at *2, 1975 Ohio App. Lexis 7443, at *5 (Ohio Ct. App. May 5, 1975)).

Defendants argue that Ohio Revised Code Section 2744.03(A)(6) entitles them to immunity. Ms. Cannon counters that the actions of Officers Meek and Green fall under one of the exceptions to the Ohio immunity statute.

Ohio Revised Code Section 2744.03(A)(6) grants immunity to Ohio public employees "unless their acts or omissions were (1) "manifestly outside the scope of [their] employment" or

(2) done with "malicious purpose, in bad faith, or in a wanton or reckless manner." *Folks v. Pettit*, 676 F. App'x 567, 572 (6th Cir. 2017) (quoting Ohio Revised Code § 2744.03(A)(6)(a)–(b)). The Sixth Circuit has held that evidence of gratuitous force related to an excessive force claim is "'sufficient to establish a genuine issue of material fact as to whether [the defendant] acted maliciously or in bad faith.'" *Id.* (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 610 (6th Cir. 2006)).

As discussed above, there is a genuine issue of material fact as to whether Officers Meek and Green used excessive force against Ms. Cannon in taking her to the ground and then delivering strikes when she posed little or no threat to the officers. These actions coupled with the statement by Officer Meek to "let me fucking get her" could lead a reasonable jury to find that Officers Meek and Green acted with malicious purpose, bad faith, or in a reckless manner. (Doc. 1, Compl. at ¶ 36; Doc. 26-2, B. Cannon Dep. at 97). Because this Court has found that there is evidence of gratuitous force relating to Cannon's § 1983 excessive force claim, this Court also finds that there is a genuine issue of material fact regarding whether Officers Meek and Green can be found liable under Ohio law for battery. Therefore, the Motion for Summary Judgment with regards to the Ohio state law battery claim is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons the Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  Defendants are entitled to summary judgment on the claims brought against Licking County and the individual defendants sued in their official capacities.  Plaintiff's claims against Officers Meek and Green for violations of Ms. Cannon's constitutional right to be free from excessive force and Plaintiff's claims for battery under Ohio state law remain pending.

The parties should contact Magistrate Judge Deavers' chambers to schedule a settlement conference.  The Clerk shall remove Document 26 from the Court's pending motions list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**